**24SD-CC00059**

Electronically Filed - STODDARD - June 05, 2024 - 08:51 PM

**IN THE CIRCUIT COURT OF STODDARD COUNTY, MISSOURI**
**THIRTY-FIFTH JUDICIAL CIRCUIT**

GRANDVIEW POULTRY, LLP

    Plaintiff,

v.

TYSON FOODS, INC.,
TYSON CHICKEN, INC.,
    **Serve Registered Agent**:
    United Agent Group Inc.
    12747 Olive Blvd., Suite 300
    St. Louis, MO 63141

MARK AVERY,
    **Serve at**:
    9144 Co. Rd. 659
    Dexter, MO 63841

CAL-MAINE FOODS, INC.,
    **Serve Registered Agent**:
    CSC-Lawyers Incorporating Service
    Company
    221 Bolivar Street
    Jefferson City, MO 65101

    Defendants.

**JURY TRIAL DEMAND**

Case No. _____

## PETITION — CLASS ACTION

Plaintiff Grandview Poultry, LLP, individually and on behalf of all similarly situated individuals or entities (approximately 45 in total, far less than 100) (collectively "**Plaintiff**" and/or the "**Class Members**"), bring this Petition against Defendants Tyson Foods, Inc., Tyson Chicken, Inc. (collectively, "**Tyson**" or the "**Tyson Companies**"), Mark Avery ("**Avery**"), and Cal-Maine Foods, Inc. ("**Cal-Maine**") (together, Tyson, Avery, and Cal-Maine are "**Defendants**") and allege the following upon knowledge and belief and investigation of counsel:

## I.    INTRODUCTION

1.    This lawsuit is about Defendants' anticompetitive and fraudulent scheme to eliminate competition for the processing of poultry, reduce the supply of broiler chickens, and achieve artificially high profits. Defendants' scheme has devastated the community of Dexter, Missouri and the many chicken farmers in that area.

2.    For decades, Tyson operated a vertically integrated chicken production system in Dexter, Missouri (the "**Dexter Complex**").

3.    At Tyson's urging, families took on millions of dollars of debt and built chicken farms to meet Tyson's specific requirements.  Many of these families had no farming experience, no business experience, and no collateral.

4.    Most of the chicken houses built to Tyson's specifications were financed by a handful of "poultry banks."  The poultry loans were largely risk-free to the banks because they were guaranteed through various government programs.

5.    This model — forcing farmers to build Tyson's chicken houses with financing from government-backed loans — shifted financial exposure and risk from Tyson and the poultry banks and placed the risks firmly on the backs of farmers and U.S. taxpayers.

6.    The chicken houses built to Tyson's specifications and financed by poultry banks could be used for one thing and one thing only:  Raising chickens for slaughter at Tyson's plant in Dexter.

7.    It was not just chicken farmers who put everything on the line for Tyson.  Hundreds of people worked in the Dexter processing plant, and dozens of companies supplied various materials and services to the plant.

8.    The Tyson chicken processing plant was the lifeblood of the Dexter community.

9. But in August 2023, Tyson abruptly announced the shuttering of the Dexter plant.

10. Tyson's August 7, 2023 closure announcement shocked and devastated the Dexter community, though Defendant Cal-Maine apparently knew it was coming, because upper-level management officials from Cal-Maine were present at Tyson's Dexter Complex on August 7, 2023 and the following day.

11. Tyson also shuttered several other plants around the country in recent months, including a plant in Noel, Missouri.

12. Tyson's actions were immediately met with scrutiny from lawmakers, including United States Senator Josh Hawley and Missouri Attorney General Andrew Bailey. These elected officials raised concerns that Tyson's closing of the Dexter plant would destroy the local economy, eliminate hundreds of jobs, and wipe out families who had built chicken farms with borrowed money to meet Tyson's specifications.

13. Senator Hawley and Attorney General Bailey warned Tyson not to take any steps to prevent a competitor from acquiring the Dexter plant. Senator Hawley and Attorney General Bailey made clear that any attempt by Tyson to prevent a chicken processor from acquiring the Dexter plant would violate the antitrust laws.

14. Senator Hawley obtained specific commitments from Tyson's CEO, Donnie King, that Tyson would not prevent a competitor (another chicken processor) from acquiring the Dexter plant. Senator Hawley reported those commitments in a September 15, 2023, social media post:

Josh Hawley ✓
@HawleyMO

I spoke with the CEO of Tyson Food today, Donnie King. He told me, first, Tyson is willing to sell its facilities in Dexter and Noel, Missouri to any interested party - including a competitor. I was glad to hear it, because anything less would violate antitrust laws. I hope Tyson is actively pursuing a sale that will save these jobs in Missouri. Second, he told me Tyson would help any farmer who wanted to keep raising chickens to do so, including helping them get new contracts with Tyson or other companies. We will hold him to these commitments

3:15 PM · Sep 15, 2023 · **245K** Views

15.    Attorney General Bailey echoed Senator Hawley in an October 3, 2023, letter to Tyson's CEO, stating that it is "paramount that you do everything in your power to either keep the facilities open or sell to any interested party, including a competitor." The letter went on to explain that a refusal to sell the Dexter plant to a competitor would violate Missouri's antitrust laws, citing a Missouri Supreme Court decision. *See Empire Storage & Ice Co. v. Giboney*, 357 Mo. 671, 676 (1948), *aff'd* 336 U.S. 490 (1949) (certain actions taken "for the purpose of refusing to sell to a certain person or persons is in direct violation of" Missouri antitrust law).

16.    Upon information and belief, Congressman Jason Smith obtained a similar commitment from Tyson — specifically, that Tyson would not take any steps to prevent a competitor from acquiring the Dexter plant.

17.    Tyson was not honest with Senator Hawley and Congressman Smith. In fact, Tyson misled them.

Electronically Filed - STODDARD - June 05, 2024 - 08:51 PM

18.    At the same time Tyson was making commitments to Senator Hawley and Congressman Smith, Tyson's internal documents prove that it ████████ Redacted ████████ ████████ Redacted ████████.[1]

19.    In an internal document, Tyson expressly stated its plan was to "████ Redacted ████ ████ Redacted ████." (Emphasis added.)

20.    ████████████ Redacted ████████████, Tyson sold the Dexter plant to Defendant Cal-Maine Foods, Inc., a non-competitor that only produces table eggs and does **not** process chickens.

21.    Selling to Cal-Maine—a seller of table eggs (not fertile eggs) that does not slaughter chickens—decimated former Tyson chicken farmers, like the Class Members, whose farms were financed and built exclusively for the chicken slaughter system. The Class's farms were not built to grow table eggs, which is an entirely different grow process.

22.    In the contract between Tyson and Cal-Maine, Defendants stipulated to a "Property Use Agreement." The "Property Use Agreement" between Tyson and Cal-Maine is referenced in a document titled "Memorandum of Understanding" that Defendants filed publicly with the Stoddard County Recorder of Deeds at Book 2024 page 774.

23.    Tyson did *not* file the Property Use Agreement with the Stoddard County Recorder of Deeds. In fact, the Property Use Agreement expressly states "████ Redacted ████ ████ Redacted ████." (Underline in the original.) This is because Tyson does not want the public, including Missouri's elected officials, to know the terms of the Property Use Agreement.

---

[1] This Petition redacts information that the Tyson Defendants have designated a "confidential." The information is not actually confidential, and Plaintiff will seek leave of the Court to file an unredacted Petition. Missouri court proceedings are to be open and accessible to the public.

24. The terms of the Property Use Agreement [Redacted]

[Redacted]

[Redacted] The Property Use Agreement [Redacted]

[Redacted]

25. The publicly filed Memorandum of Understanding does not reveal the terms of the Property Use Agreement, but it does reflect that the "Property Use Agreement shall remain in force and effect . . . [until] the **twenty-fifth (25th) anniversary**" of Defendants' execution of the Memorandum of Understanding.

26. Tyson's decision to shutter the Dexter Complex put chicken farmers out of work. And through the Property Use Agreement, [Redacted]

[Redacted]

27. Due to the contract between Tyson and Cal-Maine, [Redacted]

[Redacted] for the next 25 years.

28. The contract between Tyson and Cal-Maine is a blatant restraint of trade in violation of Missouri's antitrust laws. *See* R.S. Mo. §§ 416.031.1, 416.031.3.

29. Defendants' restraint of trade has eliminated (and will eliminate for 25 years) any competition in the Dexter market area for the services of chicken grower farmers like Plaintiff and the Class Members, causing them substantial harm.

30. In conjunction with its announced closure of the Dexter Complex, Tyson then wrongfully terminated its contracts with the chicken farmers in the Class.

31. For certain farmers in the Class, Tyson used strong-arm tactics to coerce them into signing agreements that purported to release Tyson from any liability for its wrongdoing (or at least its wrongdoing committed through a certain specified date). Of the class members who

signed a release, all purported releases signed by class members were signed on or before September 2, 2023, with the exception of one class member who signed its release on November 28, 2023.

32.    Those releases, however, do not apply to any actions by Tyson that give rise to the claims in this lawsuit because such conduct occurred **after** the releases were signed. The releases thus do not apply to the claims asserted in this lawsuit about the "Property Use Agreement" that Tyson and Cal-Maine agreed to in their December 29, 2023 Purchase and Sale Agreement.

## II.    JURISDICTION AND VENUE

33.    Jurisdiction is proper in this Court as to Tyson because the Tyson Companies each do substantial business in Stoddard County, and they owned and managed property in Stoddard County before selling that property to Cal-Maine.

34.    Jurisdiction in this Court is also proper as to Cal-Maine, as it purchased and now owns the Dexter Complex in Stoddard County, Missouri.

35.    Venue is proper in this Court because Plaintiff was injured in this County. In addition, the Dexter Complex is in Stoddard County, and Defendant Avery resides in Stoddard County.

## III.    PARTIES

36.    Plaintiff Grandview Poultry, LLP is a Limited Liability Partnership in good standing and organized under the laws of the State of Arkansas, with its principal place of business being 2325 Highway 166N, Maynard, Arkansas, who since 2020 contracted with the Tyson Companies to operate three (3) separate farms to produce pullets for the Tyson Companies, farm #6905, 6906, 6907. Those farms are situated at 75 Grandview Road, Maynard, Arkansas

37.    Defendant Tyson Foods, Inc. is a corporation formed under the laws of the State of Delaware with its principal place of business at 2200 W Don Tyson Pkwy # CP131, Springdale, Arkansas.

38.    Defendant Tyson Chicken, Inc. is a corporation formed under the laws of the State of Delaware with its principal place of business at 2200 W Don Tyson Pkwy # CP131, Springdale, Arkansas. It is a wholly owned subsidiary of Tyson Foods, Inc. and at all times relevant operated the Dexter Complex, which included but was not limited to a chicken hatchery, chicken feeding operation, feed mill, chicken processing plant, and management of the same in Stoddard County, Missouri.

39.    Defendant Mark Avery ("**Avery**") is an individual residing in Stoddard County, Missouri and at all relevant times Avery was an employee and agent of the Tyson Companies in a supervisory and/or management role, including but not limited to the position of Complex Manager of the Dexter Complex.

40.    All representations, communications, non-disclosures, concealments and any other acts herein described that were committed by Avery were committed within the course and scope of his employment with the Tyson Companies.

41.    All representations, communications, non-disclosures, concealments and any other acts herein described that were committed by Avery were committed: to further the business and business interests of his employer, the Tyson Companies; under the general authority of and at the direction of the Tyson Companies; and such that they naturally arose from the performance of Avery's employment responsibilities.

42.    Defendant Cal-Maine Foods, Inc. is a corporation formed under the laws of the State of Delaware with its principal place of business in Ridgeland, Mississippi.

## IV.    BACKGROUND AND ALLEGATIONS COMMON TO ALL COUNTS

43.    From January 1998 until late 2023, Tyson Foods, Inc., and Tyson Chicken Inc., (the "**Tyson Companies**" or "**Tyson**") operated a vertically integrated chicken production system based in Stoddard County, Missouri.

44.    Under this vertically integrated chicken production system in Stoddard County, the Tyson Companies owned all chickens throughout the hatching, growing and slaughter process. Although the Tyson Companies owned all chickens, the Tyson Companies contracted with farmers to care for the chickens through every step of the chicken production system.

45.    That is, instead of investing in the land, facilities, and labor needed to care for their chickens, the Tyson Companies designed a business model of entering into arrangements with farmers, like the Class Members. These farmers, in turn, and based on the Tyson Companies' representations, were induced to invest millions of dollars in capital needed to build and maintain chicken houses.

46.    Plaintiff and the Class Members are required to maintain these houses (pursuant to the Tyson Companies' specifications), provide the equipment required to care for the chickens (pursuant to the Tyson Companies' specifications), and pay for the labor needed to successfully care for the chickens (pursuant to the Tyson Companies' specifications).

47.    The Tyson Companies eventually processed the chickens at their chicken processing plant in Dexter, Missouri (the "**Dexter Complex**").

48.    The Dexter Complex has operated as a slaughterhouse for chickens since 1893.

49.    Broiler chickens account for nearly all domestic chicken consumption.

50.    Today, production of broiler chickens is concentrated into localized networks of production dominated by vertically integrated poultry companies, like Tyson. Tyson enters into

poultry growing arrangements with thousands of growers, who typically are small, family-owned operations. These small grower operations provide Tyson with broiler grow-out services until the birds reach slaughtering weight.

51.    Tyson typically contracts with growers whose operations are within 50 miles of one of its processing plants. That means that if the Tyson plant is the only plant within 50 miles, growers in that area can only grow for the Tyson Companies.

52.    There is no other chicken processing plant within 50 miles of Dexter, Missouri. As a result, all farmers who provided and/or cared for chickens supplied to the Dexter Complex (*i.e.*, the Class Members) have only one option for where to grow and sell chickens: Tyson.

53.    Each named Plaintiff and Class Member contracted with the Tyson Companies to produce broiler chickens for Tyson or to produce pullet or breeder chickens for Tyson. After Plaintiff performed broiler grow-out services through the time that the birds reached slaughtering weight, Tyson then slaughtered the chickens at its Dexter Complex.

54.    Tyson entirely controls the grow-out process, including: the genetics of the Broilers; the amount, type and timing of the broilers delivered; the composition, amount, and delivery schedule of feed; the distribution of medical services and medication to the broilers; the structure, temperature, ventilation, lighting duration, and other aspects controlling the environment of the chicken houses; the decision of whether to cull or condemn chickens; the length of time that growers are permitted to raise the chickens; the time, method, and manner that chickens will be picked up for processing; the time between when chickens are picked up and when they are weighed; and the disposal method of birds and their excrement by the growers.

55.    In addition to appreciating the benefits of the millions of dollars of investments by farmers like Plaintiff, the Tyson Companies also enjoyed the benefit of the farmers being liable

for any potential violations of federal and state law, liability for environmental damages, premises liability, worker injuries, public nuisance, and other liabilities in connection with Tyson's operation of the Dexter Complex in Stoddard County.

56.    But after operating in Stoddard County for years, on August 7, 2023 the Tyson Companies abruptly announced that all operations at the Dexter Complex would cease in October 2023.

57.    The Tyson Companies had known for a significant period of time that it would cease operations at the Dexter Complex by the end of 2023.

58.    After announcing the planned closure of the Dexter Complex on August 7, 2023, Tyson made assurances that it would do its best to sell the Dexter Complex to another meat-processing company (i.e., a competitor).

59.    But internal ███████████ Redacted ███████████
███████ Redacted ███████ .

60.    Instead, Tyson negotiated a deal to sell the Dexter Complex to Cal-Maine for roughly ███ Redacted ███, according to the Purchase and Sale Agreement dated December 29, 2023 between Tyson and Cal-Maine ("**Dexter Sale Agreement**"). This sale price was significantly ████████ Redacted ████████
███████ Redacted ███████
███████ Redacted ███████
███████████████████████
████ Redacted ████ is evidence that this transaction was not a product of fair market negotiation, but rather collusion between Tyson and Cal-Maine for the purpose to restrain trade and suppress the market supply of chicken meat.

61.   The Dexter Sale Agreement referred to a " Redacted

Redacted between Tyson and Cal-Maine. This was Redacted after Tyson announced it was

closing the Dexter Complex, and its timing further shows Redacted

Redacted Tyson did exactly the opposite.

62.   The Dexter Sale Agreement between Tyson and Cal-Maine Redacted

Redacted

63.   The Dexter Sale Agreement between Tyson and Cal-Maine oddly Redacted

Redacted

Redacted

64.   The Dexter Sale Agreement between Tyson and Cal-Maine Redacted

Redacted

Redacted

65.   After the closure of the Dexter Complex, farmers like Plaintiff received copies of Tyson-drafted form contracts for them to sign in order to do business with Cal-Maine.

66.   These form contracts included a term requiring former Tyson farmers to give up any claims they may have against Tyson in order for them to do business with Cal-Maine.

67.   Two other Redacted the Dexter Sale Agreement between Tyson and Cal-Maine are Redacted titled "Memorandum of Understanding." The latter was filed publicly with the Stoddard County Recorder of Deeds at Book 2024 Page 774.

68.   The Memorandum of Understanding refers in vague terms to a "Property Use Agreement" between Tyson and Cal-Maine, including the facts the "Property Use Agreement" "shall remain in force and effect" for 25 years and that it "shall bind Cal-Maine, any successor

Electronically Filed - STODDARD - June 05, 2024 - 08:51 PM

grantee, transferee, assignee, owner, tenant or any other party in possession" of the property on which the Dexter Complex was located.

69.    But the publicly filed document does not detail or describe the terms and conditions imposed by Tyson in the "Property Use Agreement."

70.    That is because the terms of the Property Use Agreement are illegal and violate Missouri law.

71.    For its 25-year duration, the Property Use Agreement ████████ Redacted ████████
████████████████ Redacted ████████████████
████████ Redacted ████████

72.    The ████ Redacted ████ in the Property Use Agreement between Tyson and Cal-Maine are per se illegal under Missouri law. Alternatively, these provisions unreasonably restrain trade in the market for chicken farmer services in the Dexter, Missouri relevant market area.

73.    There is a relevant product or service market for chicken farmer services that consists of chicken farmers (including breeder farmers, pullet farmers, and broiler farmers) who offer their services to meat-processing companies.

74.    There is a relevant geographic market for chicken farmer services (as defined in the prior paragraph) that consists of Dexter, Missouri and any chicken farm located within approximately 50 miles of the Dexter Complex.

75.    There are no conceivable pro-competitive benefits for Tyson's and Cal-Maine's restraint of trade embodied in the Property Use Agreement.

76.    Even if any alleged pro-competitive benefits exist, they are substantially outweighed by the anticompetitive effects of Defendants' contract, combination or conspiracy in

Electronically Filed - STODDARD - June 05, 2024 - 08:51 PM

restraint of trade.

77.    Tyson and Cal-Maine collectively have market power in the geographic market surrounding the Dexter Complex in that they [Redacted] control the permissible uses of the Dexter Complex for the next twenty-five years.

78.    Enormous barriers to entry preclude effective competition in the relevant service market (defined above) in that significant capital expenditure would be required to construct a new meat-processing facility in the geographic market surrounding the Dexter Complex.

79.    The anticompetitive agreement and conduct of Tyson and Cal-Maine have had the following effects, among others, causing antitrust injury:

a.    Sellers of chicken farming services (like Plaintiff) are denied [Redacted] [Redacted] in the Dexter, Missouri geographic market for the next 25 years;

b.    Price competition has been severely restrained among buyers of chicken farming services;

c.    Owners of the barns and infrastructure designed to produce chickens for meat production have suffered severe diminution in value of their business and property as there will be [Redacted] in the Dexter, Missouri geographic market for the next 25 years, thereby reducing the value of the farmers' multi-million-dollar investments to nearly nothing; and

d.    Tyson has inflated its profits by contracting and combining with Cal-Maine to reduce the supply of broiler chickens and to inflate prices to consumers of chicken while reducing (to zero) prices paid to sellers of chicken farming services (like Plaintiff) in the Dexter, Missouri geographic market.

80.    By reason of the violations of Missouri's Antitrust Law alleged above, Plaintiff and

the Class Members have sustained injury to their business or property, having been deprived of competition in the market for the purchase of their chicken farming services in the Dexter, Missouri geographic market. As a result of this conduct by Defendants Tyson and Cal-Maine, Plaintiff and Class Members have suffered damages.

81.    The [Redacted] in the Property Use Agreement between Tyson and Cal-Maine unreasonably restrains trade in violation of Missouri law and harms each Plaintiff and Class Member in an amount to be proven at trial.

82.    Plaintiff and the Class Members have suffered an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

83.    Plaintiff, on behalf of itself and the proposed Class, re-allege and incorporate by reference the foregoing paragraphs (and those in specific Counts below) as if fully set forth herein.

84.    Plaintiff seeks to represent the following Classes:

**All Missouri and Arkansas chicken farmers who contracted with Tyson to provide breeder, pullet, and/or broiler farming services to the Tyson Companies' operation of the Dexter Complex during any point in the four-year period before this Petition was filed.**

85.    This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria set forth in Missouri Supreme Court Rule 52.08.

86.    **Numerosity**. The proposed Class satisfies the numerosity requirements under Rule 52.08 in that its members are too numerous to practically join in a single action. The number of Class Members is likely to be 45 (and certainly far below 100).[2]  Class members may be notified of the pendency of this action by mail or other means.

---

[2] As a result, this lawsuit—which alleges violations of *Missouri* antitrust law—can only proceed in Missouri state court.  The case is not removable.  *See* Fed. R. Civ. P. 11.

87.    **Predominance**. Common questions of law and fact exist as to all members of the proposed Class and predominate over questions affecting only individual class members. These common questions include, but are not limited to:

a.    Whether Defendants' Property Use Agreement is *per se* illegal under the Missouri Antitrust Law;

b.    Whether Defendants' Property use Agreement is an unreasonable restraint of trade under the Missouri Antitrust Law;

c.    Whether Defendants' conduct has unreasonably retrained trade in the Dexter, Missouri geographic market for the purchase of chicken farmer services;

d.    Whether the Class is entitled to a declaration and Order declaring that Defendants' Property Use Agreement ▮▮▮▮Redacted▮▮▮▮ ▮▮Redacted▮▮ is unlawful and violates the Missouri Antitrust Law;

e.    Whether Defendants' conduct has tortiously interfered with the Class's ability to realize other business expectancies; and

f.    Whether the Class was injured due to Defendants' unlawful conduct.

88.    **Typicality**. Plaintiff's claims are typical of the claims of the proposed Class because they were injured by Defendants' wrongful conduct in violation of the Missouri Antitrust Law, and Defendants' wrongful conduct affected each Class Member in a similar manner, with such conduct giving rise to substantially the same claims.

89.    **Adequacy**. Plaintiff is an adequate representative of the proposed Class because its interests do not conflict with the interests of the members of the Class that it seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and

Electronically Filed - STODDARD - June 05, 2024 - 08:51 PM

Plaintiff will prosecute this action vigorously by monitoring and directing the actions of Class counsel. The interests of members of the Class will be fairly and adequately protected by Plaintiff and undersigned counsel.

90.     **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, though significant, may not be of such magnitude as to make the prosecution of individual antitrust actions against Defendants economically feasible. Even if Class members availed themselves of individual litigation and asserted their antitrust claims individually, the court system could not sustain such an imposition. In addition to the burden and expense of managing many actions arising from Defendants' anticompetitive scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

91.     In the alternative, the proposed Class may be certified because:

a.     the prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

b.     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other

Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c.   Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

**CLAIMS FOR RELIEF**

**COUNT I – VIOLATION OF MISSOURI'S ANTITRUST STATUTES**
**(R.S. Mo. §§ 416.031.1, 416.031.3)**
**Tyson Companies and Cal-Maine**

92.   Plaintiffs incorporates by reference all foregoing paragraphs (and those in other Counts) as if fully set forth herein and further states as follows.

93.   As set forth in detail above, Defendants Tyson and Cal-Maine have engaged in a contract, combination, or conspiracy that unreasonably restrains trade and commerce in violation of the Missouri Antitrust Law, R.S. Mo. § 416.031. Tyson's and Cal-Maine's conduct violates both subsections 1 and 3 of Section 416.031.

94.   The anticompetitive conduct alleged in this Petition consists of the Property Use Agreement between Tyson and Cal-Maine described in detail above.

95.   In furtherance of their anticompetitive scheme, Tyson and Cal-Maine committed one or more overt acts, including but not limited to:

a.   agreeing to the anticompetitive terms of the Property Use Agreement;

b.   executing the Property Use Agreement;

c.   transferring and/or receiving the deed for the property at issue subject to the Property Use Agreement;

18

d. filing with the Stoddard County Recorder of Deeds a vague and misleading "Memorandum of Understanding" that seeks to conceal from the public the truth about their illegal and anticompetitive scheme affecting the Dexter Complex; and

e. Conspiring to [Redacted] for the purpose of restraining trade.

96. Defendants' anticompetitive conduct has restrained (indeed, eliminated) competition for the purchase of chicken farmer services in the Dexter, Missouri geographic area. This harm to competition substantially outweighs any purported pro-competitive benefits allegedly arising from Defendants' conduct.

97. [Redacted], another existing or newly created meat-processing company would have paid Tyson [Redacted] to purchase the Dexter Complex and thereby strengthen competition for the purchase of chicken farmer services in the Dexter, Missouri geographic area, allowing sellers of chicken farmer services like Plaintiff and Class Members to receive a fair and competitive price for their services.

98. Tyson's and Cal-Maine's conduct is a *per se* violation under the Missouri Antitrust Law.

99. Alternatively, Tyson's and Cal-Maine's conduct is illegal under the Missouri Antitrust Law under a rule-of-reason analysis.

100. As a direct and proximate result of Tyson's and Cal-Maine's violations of the Missouri Antitrust Law, Plaintiff and Class Members have been injured in their business and property and suffered damages in an amount to be proven at trial.

101. Under R.S. Mo. § 416.121, Plaintiff and Class Members are entitled to an award of threefold damages and reasonable attorneys' fees.

19

WHEREFORE, Plaintiff and the Class Members pray of this Court for its judgment in favor of Plaintiff and the Class Members and against the Tyson Companies and Cal-Maine, jointly and severally, and awarding Plaintiff and the Class Members their damages incurred herein in an amount that is fair and reasonable in excess of this Court's jurisdictional threshold (and thereafter increased threefold), for prejudgment and post-judgment interest, for Plaintiff's attorney fees and costs incurred herein, and for such other relief as this honorable Court deems just and proper.

**COUNT II – DECLARATORY AND INJUNCTIVE RELIEF**
**UNDER THE MISSOURI ANTITRUST LAW**
**(R.S. Mo. § 416.121)**
**Tyson Companies and Cal-Maine**

102.    Plaintiff incorporates by reference all foregoing paragraphs (and those in other Counts) as if fully set forth herein and further states as follows.

103.    As detailed above, Defendants Tyson and Cal-Maine have engaged in a contract, combination, or conspiracy that unreasonably restrains trade and commerce in violation of the Missouri Antitrust Law, R.S. Mo. § 416.031.

104.    Under R.S. Mo. § 416.121.2, a plaintiff harmed by a violation of the Missouri Antitrust Law may "[b]ring proceedings to enjoin the unlawful practices."

105.    As detailed above, Plaintiff and Class Members have been harmed by Tyson's and Cal-Maine's violations of the Missouri Antitrust Law.

106.    Plaintiff and Class Members hereby seek a declaration and Order from this Court declaring that Tyson's and Cal-Maine's conduct — specifically, the [Redacted] of their Property Use Agreement — is unlawful and violates the Missouri Antitrust Law and enjoining them from engaging in any conduct determined to be unlawful.

107.    Plaintiff and Class Members request that the Court strike and invalidate the Property Use Agreement, as it is void against public policy and the Missouri Antitrust Law for the reasons alleged in detail above.

WHEREFORE, Plaintiff and Class Members pray of this Court for its judgment in favor of Plaintiff and Class Members and against the Tyson Companies and Cal-Maine, jointly and severally, and for entry of an Order: declaring that the ▓▓▓▓ Redacted ▓▓▓▓ in Tyson's and Cal-Maine's Property Use Agreement are unlawful and violate the Missouri Antitrust Law such that they are stricken, invalidated, and rendered void; enjoining the Tyson Companies and Cal-Maine from engaging in any conduct determined to be unlawful; and awarding Plaintiff and Class Members their reasonable attorneys' fees and costs of the suit, and for such other relief as this honorable Court deems just and proper.

## COUNT III – TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Each Defendant)

108.    Plaintiff incorporates by reference all foregoing paragraphs (and those in other Counts) as if fully set forth herein and further states as follows.

109.    As described in detail in this Petition, Defendants carried out a scheme to harm and eliminate competition in the Dexter, Missouri geographic market for the purchase of chicken farmer services.

110.    Defendants have harmed Plaintiff and Class Members and rendered it impossible for them to do business with other meat-processing companies that compete with Tyson in the production of chicken products.

111.    Defendants took these wrongful actions intentionally to unlawfully reduce competition against Tyson and with the purpose and effect of causing Plaintiff to be unable to find alternative business partners.

Electronically Filed - STODDARD - June 05, 2024 - 08:51 PM

112.    Defendants knew of and were aware of the possibility that other business expectancies may exist for Plaintiff and the Class Members, yet Defendants acted to squash any possibility of these other business expectancies ever coming to pass by executing the Dexter Sale Agreement with the 25-year [Redacted] in the Property Use Agreement.

113.    The Tyson Companies publicly promised that they understood the importance placed on selling the Dexter Complex to a competitor company that processes meat. Instead, internally, the [Redacted] [Redacted] [Redacted]

114.    Defendants also sought to conceal their wrongful conduct from the public and from Plaintiff through filing only a vague and incomplete "Memorandum of Understanding" with the Stoddard County Recorder of Deeds. That "Memorandum of Understanding" references but does not describe the significant 25-year [Redacted] affecting the Dexter Complex due to the Property Use Agreement between Tyson and Cal-Maine.

115.    As reflected by [Redacted], Defendant Mark Avery played a critical role in causing the Dexter Sale Agreement to be reached and executed.

116.    Earlier in 2023, Defendant Avery also laid the groundwork for Defendants' scheme by wrongfully and fraudulently inducing many chicken farmers to enter into "Release" agreements with Tyson.

117.    The farmers executing those Releases, at the behest and urging of Defendant Avery, had no inkling that Tyson and Cal-Maine would, months later, enter into a contract, combination, and/or conspiracy in violation of the Missouri Antitrust Law by [Redacted] [Redacted] at the Dexter property for the next 25 years.

118.    Because those Release agreements were executed months before the conduct giving rise to Plaintiff and the Class Members' claims asserted in this Petition, those releases cannot possibly affect, modify, or release the claims asserted here.

119.    In addition, any such Release agreement was executed under duress and without full knowledge of all relevant facts, including facts and/or then-current fraudulent intentions known to Tyson, Avery, and Cal-Maine but concealed from Plaintiff.

120.    But for Defendants' wrongful conduct, Plaintiff and the Class Members were reasonably certain to have realized alternative business expectancies.

121.    Plaintiff and the Class Members are aware of and have reason to believe that multiple serious competitive buyers would have sought to purchase the Dexter Complex Redacted Redacted

122.    With respect to their actions in December 2023 relating to the execution of the Dexter Sale Agreement, Defendants' wrongful conduct and concealment of their true intentions has harmed Plaintiff and the Class Members, who as a direct result have been unable to realize other business expectancies.

WHEREFORE, Plaintiff and the Class Members pray of this Court for its judgment in favor of Plaintiff and Class Members and against all Defendants, jointly and severally, and awarding Plaintiff and Class Members their damages incurred herein in an amount that is fair and reasonable in excess of this Court's jurisdictional threshold, for prejudgment and post-judgment interest, for Plaintiff and the Class Members' attorney fees and costs incurred herein, and for such other relief as this honorable Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment awarding the following:

a.    An order certifying the proposed Class and appointing Plaintiff and undersigned counsel to represent the Class;

b.    An order awarding Plaintiff and the Class Members their actual damages, and/or all other form of monetary relief provided by and pursuant to law;

c.    An order enjoining Defendants from further engaging in the conduct alleged herein; and

d.    An order awarding Plaintiff and the Class Members pre-judgment and post-judgment interest, attorneys' fees and costs, and all other relief as allowed under the law.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 5, 2024

Respectfully submitted by:

THE OLIVER FIRM, L.C.

/s/ Russell D. Oliver
RUSSELL D. OLIVER        MO #59394
1402 N. Outer Rd, Ste. A
Dexter, MO 63841
Tele:   (573) 614-7959
russ@oliver-lawfirm.com

CLAYTON JONES, ATTORNEY AT LAW

/s/ Clayton Jones
Clayton Jones            MO #51802
P.O. Box 257
405 W. 58 Hwy.
Raymore, MO 64083
Tele:   (816) 318-4266
Fax:    (816) 318-4267
clayton@claytonjoneslaw.com

BOULWARE LAW LLC

/s/ Brandon J.B. Boulware

| | |
|---|---|
| Brandon J.B. Boulware | MO #54150 |
| Jeremy M. Suhr | MO #60075 |

1600 Genessee, Suite 956A
Kansas City, MO 64102
Tele:   (816) 492-2826
Fax:    (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

WHITE, GRAHAM, BUCKLEY, & CARR L.L.C.

/s/ Bryan White

| | |
|---|---|
| Bryan T. White | MO #58805 |
| Deborah J. Blakely | MO #47138 |

19049 E. Valley View Pkwy, Suite C
Independence, Missouri 64055
Tele:   (816) 373-9080
Fax:    (816) 373-9319
bwhite@wagblaw.com
dblakely@wagblaw.com

*Attorneys for Plaintiff*